# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**MAHADEO SARRAN,**                    Case No. 1:19 CV 226

    Plaintiff,

    v.                              Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                    MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Mahadeo Sarran ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 12). For the reasons stated below, the undersigned affirms the decision of the Commissioner.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB in May 2016, alleging a disability onset date of January 18, 2016. (Tr. 393-96). His claims were denied initially and upon reconsideration. (Tr. 313-16, 322-24). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 329-30). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on December 6, 2017. (Tr. 259-89). On May 7, 2018, the ALJ found Plaintiff not disabled in a written decision. (Tr. 246-54). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-4); *see* 20 C.F.R. §§ 404.955, 404.981. Plaintiff timely filed the instant action on January 30, 2019. (Doc. 1).

**FACTUAL BACKGROUND**

Personal Background and Testimony

Born in 1968, Plaintiff was 49 years old at the time of his hearing. (Tr. 266). He had past work as a foreman and a welder. (Tr. 267). He injured his back at work in December 2015 after falling down some stairs. *See* Tr. 265. Plaintiff believed he was no longer able to work due to pain in his lower back and pain, numbness, and tingling in his right leg. (Tr. 268-69).

At home, Plaintiff held onto chairs when ambulating and his wife assisted him. (Tr. 270). He could not stand for more than fifteen to twenty minutes at a time before needing to sit due to pain. *Id*. Plaintiff could sit for "maybe" fifteen to twenty minutes before needing to shift positions and for twenty-five to thirty minutes before needing to stand. (Tr. 271). *Id*. Plaintiff estimated he could be on his feet for two and a half to three hours in an eight-hour workday. *Id*. He could sit for two to three hours during the same period, but would need to be able to stand and move around. *Id*.

Plaintiff needed to lie down during the day due to pain. (Tr. 271-72). Sometimes he rested in a recliner. *Id*. He had trouble focusing due to pain, but noted his pain was controlled with medication. (Tr. 274). Injections and chiropractic care did not provide any relief. (Tr. 275).

Plaintiff also had pain in his neck and an injury to a finger on his left hand. (Tr. 276-77). He estimated that he could lift twenty to twenty-five pounds, but could not carry twenty pounds for "too long", and could not carry the weight up stairs. (Tr. 277).

Plaintiff lived with his wife. (Tr. 278). In a typical day, he spent time on the couch watching movies and television. (Tr. 272). He tried to help with household chores, but was only able to for ten to fifteen minutes at a time. *Id*.

Relevant Medical Evidence

Plaintiff treated with Sharmin Choudhury, M.D., in December 2015. (Tr. 481). He reported "sharp shooting lower back pain" after falling. *Id*. Plaintiff described the pain as "constant", worse with bending and alternating between sitting and standing. *Id*. Dr. Choudhury noted lumbar spine tenderness on examination. (Tr. 482). He diagnosed a lumbar spinal cord injury and prescribed naproxen. (Tr. 482-83). A lumbar spine MRI taken that month revealed diffuse posterior bulging discs at L4-5 and L5-S1, deforming of the thecal sac and bilateral L5 and S1 nerve roots. (Tr. 471). There were also hypertrophic changes of the bilateral articular facets resulting in bilateral neural foraminal encroachment and deformity upon the exiting L4 and L5 nerve roots. *Id*. The MRI also revealed hypertrophic changes of the bilateral articular facets at L3-4 (and to a lesser extent L2-3 and S1-S2), with adequate neural foramina. *Id*. Plaintiff returned to Dr. Choudhury in January 2016 reporting continued "sharp" lower back pain radiating to the legs, worse with bending. (Tr. 477). Dr. Choudhury again found tenderness in the lumbar spine. (Tr. 478). He continued Plaintiff's diagnosis. *Id*.

In March 2016, Plaintiff treated at the emergency room for lower back pain resulting from the December 2015 injury. (Tr. 513). Plaintiff noted the pain was "minimal" in a neutral position, but increased if he leaned or lifted; he had numbness in his right leg. *Id*. On examination, Plaintiff had nonischemic tenderness in his lumbar spine and limited range of motion (secondary to discomfort) as well as minimal paralumbar musculoskeletal tightness without definitive spasms. (Tr. 514). Providers diagnosed degenerative change of the lower lumbar spine. (Tr. 515).

Plaintiff treated at the Lakewood Pain Management and Chiropractic Center beginning in April 2016. (Tr. 523-26). At his initial evaluation, Plaintiff described a workplace injury where he was carrying tools and slipped down a set of stairs, grabbing a handrail to break his fall. (Tr. 523).

He heard a "[p]opping sound" and felt something "shift" in his lower back; he felt his head "snap" backwards with a "weird", sharp, "tingly", sensation in his neck immediately following. *Id.* On examination, Plaintiff had tenderness to digital palpation and muscle tension on both sides of the cervical spine. (Tr. 524). He rated this tenderness at a one or two out of five, with five being "very severe". *Id*. Plaintiff also had tenderness with digital palpation and muscle tension on both sides of his lumbar spine, which he rated at three or four out of five. *Id.* Plaintiff had normal manual muscle testing in his lower extremities. (Tr. 524-25). He had positive straight leg raises on the right side at ten degrees with pain in the lower back. (Tr. 525). Glenn Bogazot, D.C., diagnosed lumbar disc bulges at L3-L4 and L4-L5, a lumbosacral disc bulge at L5-S1, and lumbar radiculitis. *Id*. He recommended manipulative therapy and therapeutic exercises. (Tr. 525-26). Doctors believed Plaintiff's "condition [would] respond favorably to rehabilitation care and that a reasonable expectation for functional improvement exist[ed]." (Tr. 526).

Plaintiff treated at the emergency room in August 2016 for low back pain. (Tr. 547). He reported worsening pain in his lower back which radiated down his right leg; he had tingling in the right thigh. *Id*. On examination, Plaintiff had no bony tenderness or swelling in the lumbar region and no midline tenderness. (Tr. 549). His sensation was grossly intact, *id.*, and he had a steady gait (Tr. 550). The provider diagnosed an acute exacerbation of chronic low back pain and provided medication. (Tr. 549). In December 2016, Plaintiff returned to the emergency room for low back pain radiating to his legs; he again reported right thigh numbness. (Tr. 627). The pain was alleviated "some" with naproxen and exacerbated by bending. *Id*. Plaintiff had normal range of motion on examination. (Tr. 629). The provider diagnosed lumbar radiculopathy. (Tr. 630).

A December 2016 lumbar spine MRI revealed "[v]ery mild" disc bulging and a "very small" central disc protrusion with "only mild canal stenosis", and rostral caudal facet subluxation

4

with mild bilateral foraminal stenosis (left greater than right) at L4-L5. (Tr. 738-39). There were also facet degenerative changes without significant canal stenosis and mild to moderate right, and mild left bony foraminal stenosis at L5-S1. *Id.*

Plaintiff presented to a spinal surgery center for an evaluation in January 2017. (Tr. 638). He reported lower back pain and bilateral leg pain, worse on the right side. *Id.* He reported difficulty standing up straight due to pain and an inability to walk more than ten minutes at a time. *Id.* Plaintiff further reported numbness and weakness in his right thigh. *Id.* On examination, Plaintiff had decreased soft touch sensation in the right thigh, an antalgic gait, and negative straight leg tests. (Tr. 641). The physician recommended back strengthening exercises, pain medication, and a right L5-S1 epidural injection. *Id.*

Plaintiff began treating with Philip Tomsik, M.D., in January 2017. (Tr. 769). At his initial visit, Plaintiff reported ongoing lower back pain as well as pain and numbness in his right leg. *Id.* On examination, Dr. Tomsik noted "some tenderness just to the right midline of the lumbar spine" and tenderness near the right SI joint. (Tr. 771). He diagnosed lumbar back pain with radiculopathy affecting the right lower extremity and foraminal stenosis of the lumbar region. (Tr. 772). Dr. Tomsik referred Plaintiff to pain management and instructed him to follow up with a neurosurgery consultation as planned. *Id.*

Plaintiff attended an initial evaluation at the Fairview Pain Management Center in February 2017. (Tr. 735). He reported lower back pain rated nine out of ten, which was worse with sitting, standing, forward flexion, lifting, rising from a seated position, lying down, and walking. *Id.* The pain was alleviated with medication. *Id.* On examination, Plaintiff had tenderness over the right cervical facets, lumbar spine, and right L5-S1 area. (Tr. 738). His pain increased with extension of the lumbar spine and with right lateral rotation; he had negative straight leg tests bilaterally, normal

sensation, and a normal gait. *Id*. The physician diagnosed chronic right-sided low back pain with right-sided sciatica and neuroforaminal stenosis of the lumbar spine. (Tr. 740). He instructed Plaintiff to continue medications and undergo his scheduled L5-S1 injection. *Id.*

Plaintiff had a right transforaminal epidural steroid injection at L4-L5 in March 2017. (Tr. 749).[1] He had his left pinky finger amputated in April 2017 after cutting it with a table saw. (Tr. 656, 665).

Plaintiff returned to Dr. Tomsik in April 2017 reporting no changes in his back pain. (Tr. 781). On examination, Dr. Tomsik noted loss of normal lumbar lordosis. (Tr. 783). In June 2017, Plaintiff reported his back pain "ha[d] been better, more stable and less painful overall." (Tr. 789). Plaintiff had no spinous process tenderness on examination. (Tr. 791). In August, Plaintiff reported continued lower back pain (Tr. 797), and on examination, Dr. Tomsik observed "some tight paraspinals" in the para-lumbar region which was "mildly tender" (Tr. 799). By October, Plaintiff reported his lower back pain had recently worsened. (Tr. 808). On examination, he had right low back pain near the SI joint on the right side and some decreased sensation to light touch on the right thigh. (Tr. 810).

Opinion Evidence

*Treating Physicians*

Chiropractor Nicholas Hadzima, D.C., completed a medical source statement in June 2016. (Tr. 594). In it, he noted that he had treated Plaintiff from April to June 2016 for severe lumbar pain bilaterally. *Id*. Dr. Hadzima reported Plaintiff had weakness in the right plantar/dorsiflexors and decreased sensation in the right L3, L4, and L5 dermatomes. *Id*. He noted Plaintiff had a slow

---

1. This record indicates the injection was performed at L4-L5 but "Can be considered L5-S1". (Tr. 749).

6

gait with an antalgic posture. *Id*. Plaintiff was compliant with treatment and therapy but, due to the nature of injury, Dr. Hadzima opined he required continued frequent care. *Id*. He opined Plaintiff could not use his lower extremities for functional tasks, but could use his arms and hands. *Id*.

Dr. Hadzima completed a second medical source statement in November 2017. (Tr. 855-57). He opined Plaintiff could walk less than one city block without rest. (Tr. 855). Plaintiff could sit for five to ten minutes at a time before needing to get up; he could stand for five to ten minutes before needing to sit down. (Tr. 856). Dr. Hadzima opined Plaintiff could sit, stand, or walk less than ten to twenty minutes total in an eight-hour workday and responded that Plaintiff "can not work" when asked if he needed to change positions or take unscheduled breaks during a workday *Id*. He noted Plaintiff could "rarely"[2] twist or lift less than ten pounds. *Id*. He could never lift ten pounds or more, stoop, crouch/squat, or climb ladders or stairs. *Id*. Finally, Dr. Hadzima opined Plaintiff "[could not] sustain gainful employment". (Tr. 857).

Dr. Tomsik completed a medical source statement in November 2017. (Tr. 858-60). In it, Dr. Tomsik listed diagnoses of lumbar back pain with radiculopathy and foraminal stenosis of the lumbar region. (Tr. 858). He offered a "fair" prognosis. *Id*. Dr. Tomsik opined Plaintiff's impairments would produce good days and bad days, and his impairments would cause him to be absent approximately four days per month. *Id*. When asked how many city blocks Plaintiff could walk without rest, Dr. Tomsik wrote that he was "unable to estimate". *Id*. Dr. Tomsik was also "unable to determine" how long Plaintiff could sit, stand, or walk at one time, or in an eight-hour workday. (Tr. 859). Dr. Tomsik was also "unable to determine" how many pounds Plaintiff could lift/carry, or whether he could perform activities such as twisting, stooping, crouching, or climbing. *Id*. "Based on symptoms", Dr. Tomsik "suspect[ed]" Plaintiff would need a job which would

---

2. The form defines "rarely" as "1% to 5% of an 8-hour working day". (Tr. 856).

permit shifting positions at will. *Id*. He further estimated that Plaintiff would need two to three ten to fifteen-minute unscheduled breaks throughout the day. *Id*. Dr. Tomsik was also "unable to determine" how much Plaintiff could lift, how often he could perform certain postural activities, how often Plaintiff would be off-task due to his pain symptoms, how often he could use his hands/fingers during the day, or whether Plaintiff's impairments were "reasonably consistent with the symptoms and functional limitations described in th[e] evaluation". (Tr. 859-60). Finally, Dr. Tomsik recommended Plaintiff undergo a "formal functional capacity test through physical therapy". *Id*.

VE Testimony

A VE appeared and testified at the hearing before the ALJ. *See* Tr. 284-89. The ALJ asked the VE to consider a person with Plaintiff's age, education, and vocational background who was physically and mentally limited in the way in which the ALJ determined Plaintiff to be. *See* Tr. 285-86. The VE opined such an individual could not perform Plaintiff's past work, but could perform other jobs such as an assembler, packer, or laundry worker. (Tr. 286).

ALJ Decision

In a written decision dated May 7, 2018, the ALJ found Plaintiff met the insured status requirements for DIB through December 31, 2021 and had not engaged in substantial gainful activity since his alleged onset date (January 18, 2016). (Tr. 248). He concluded Plaintiff had severe impairments of status post amputation of left small finger and foraminal stenosis of the lumbar region, but found these impairments (alone or in combination) did not meet or medically equal the severity of a listed impairment. (Tr. 248-49). The ALJ then found Plaintiff had the residual functional capacity ("RFC"):

> to perform light work as defined in 20 CFR 404.1567(b) except claimant can occasionally be required to climb ramps or stairs; can never be required to climb

8

ladders, ropes, or scaffolds; can only occasionally be required to stoop, crouch, crawl and kneel; be limited to frequent handling and fingering with the non-dominant hand; would never be required to drive a motor vehicle during the course of the workday; and would be restricted from hazards such as heights or machinery, but is able to avoid ordinary hazards in the workplace, such as boxes on the floor, doors ajar, or approaching people or vehicles.

(Tr. 249). The ALJ found Plaintiff was unable to perform past relevant work, was defined as a "younger individual" on the alleged onset date, and had a limited education (Tr. 252). The ALJ concluded that, considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (Tr. 253). Thus, the ALJ found Plaintiff not disabled from the alleged onset date, January 18, 2016, through the date of the decision. (Tr. 254).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn

"so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and

meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Plaintiff offers a single challenge to the ALJ's decision. He contends the RFC is unsupported because the ALJ failed to adequately evaluate Dr. Tomsik's opinion. (Doc. 13, at 10-15). The Commissioner responds that the ALJ did not err and his decision is supported by substantial evidence. (Doc. 16, at 5-9). For the following reasons, the undersigned affirms the decision of the Commissioner.

Generally, medical opinions of treating physicians are accorded greater deference than non-treating physicians.[3] *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96–2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2))

A treating physician's opinion is given "controlling weight" if it is supported by: (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).

---

3. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to claims filed prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819.

11

Importantly, when the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Id.* (quoting 20 C.F.R. § 416.927(d)(2)). These reasons must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Wilson*, 378 F.3d at 544 (quoting SSR 96-2p, 1996 WL 374188, at *5). When determining weight and articulating "good reasons", the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

> In evaluating Dr. Tomsik's opinion, the ALJ explained:
>
> Philip Tomsek[sic], MD on November 27, 2017 opined that he could not determine how long claimant could sit/stand/walk at a time or in a workday; he suspects that claimant would have to be able to shift positions at will; and claimant would need to take unscheduled breaks 2-3 times a day for 10-15 minutes (14F/3). Pursuant to 20 CFR 404.1527 and 20 CFR 416.927, if a treating source opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, we will accord the opinion controlling weight. However, the undersigned only gives this opinion partial weight, as it is not consistent with the other evidence in the record. Dr. Tomsek indicates himself he did not have sufficient evidence to evaluate several areas of functioning, which undercuts his conclusions. Medical imaging only indicate[s] mild stenosis, and that claimant's symptoms were improving (11F/33; 4F/5; 11F/21).

(Tr. 251).

The undersigned finds the ALJ's explanation provides the required "good reasons" to discount Dr. Tomsik's opinion. First, the ALJ concluded the opinion was inconsistent with other evidence in the record including medical imaging that indicated only mild stenosis, Tr. 251 (citing Tr. 801) (MRI results showing mild canal stenosis)), and records which showed Plaintiff's symptoms were improving, *id.* (citing Tr. 789) (June 2017 visit with Dr. Tomsik where Plaintiff noted his back pain had been "better, more stable and less painful overall.")). The ALJ's observations are supported by the record and directly implicate the factor of consistency under the regulations. *Rabbers*, 582 F.3d at 660; 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion.").

Moreover, as the ALJ accurately pointed out, Dr. Tomsik's form is incomplete. Dr. Tomsik repeatedly noted that he was "unable to estimate" or "unable to determine" the extent of nearly all of Plaintiff's functional abilities because he lacked evidence in the form of a "formal functional capacity test" to provide "clarification". (Tr. 858-60). This is a good reason to discount Dr. Tomsik's opinion as it touches on the core definition of what constitutes a "medical opinion" under the regulations which define a "medical opinion" as a "statement[] from an acceptable medical source" which reflects "judgments" regarding "what you can still do despite your impairment(s), and your physical or mental restrictions". 20 C.F.R. § 404.1527(a)(1); *Bass v. McMahon*, 499 F.3d 506, 510 (6th Cir. 2007) ("Since Dr. Naum made no medical judgments, the ALJ had no duty to give such observations controlling weight or provide good reasons for not doing so.")). Dr. Tomsik's opinion does not provide such judgments. The only "opinions" contained in his report are that Plaintiff would need a job which would allow him to shift positions at will and take two to three unscheduled breaks throughout the workday. (Tr. 859). As the ALJ noted, Dr. Tomsik

13

admitted he lacked the evidence needed to formulate an opinion regarding all of Plaintiff's other limitations. (Tr. 251). It was therefore reasonable for the ALJ to conclude this statement undercut the supportability of the two limited opinions which he did proffer. *See Blakley v. Comm'r of Soc. Sec.,* 581 F.3d 399, 407 (6th Cir. 2009) (finding the substantial evidence standard is satisfied "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'") (quoting *Warner v. Comm'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004)).

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB supported by substantial evidence and affirms that decision.

s/ James R. Knepp II<br>
United States Magistrate Judge